[No. 12733. *En Banc.* November 6, 1915.]

# F. H. HUNTWORTH, *as Pacific Teachers' Agency, Appellant,* v.. W. V. TANNER, *as Attorney General, et al., Respondents.*[1]

STATUTES—CONSTRUCTION—PREAMBLE. The body or enacting part of a law controls, if broader than the preamble; but if it can be given a construction consistent with the purpose as declared in the preamble, it will be so construed.

SAME—CONSTRUCTION—CONFLICTING SECTIONS—PREAMBLE. Section 1 of the employment agency law, Laws 1915, p. 1, reciting that the welfare of the state depends on the welfare of its "workers" and that the state, exercising its police powers, declares the collection of fees from the "workers" for furnishing employment is detrimental to the welfare of the state, is more than a mere preamble to sections 2 and 3 making it unlawful for any employment agent to receive a fee from "any person" for furnishing him employment; as it declares the intention to advance the protection of the police power to a new field, and hence to limit the law in its scope to "workers," instead of applying it to "any person."

STATUTES—CONSTRUCTION—AMBIGUITY. The employment agency law, Laws 1915, p. 1, referring in the first section to the employment of "workers" and in the next section to the employment of "any person," being so ambiguous as to incite contrary opinion as to its meaning, the first resort in its construction should be to discover the antecedent mischief, which related only to employment agencies to which laboring men, as distinguished from professional men, were compelled to resort to obtain employment.

STATUTES—CONSTRUCTION — REASONABLE OPERATION. The employment agency law, Laws 1915, p. 1, referring in the first section to the employment of "workers" and in the next section making it unlawful for any employment agent to receive a fee from "any person" for furnishing employment, construed with reference to its natural effect when put in operation, has no reasonable relation to any subject other than the protection of those classed as workers or laborers, and was not intended to apply to school teachers who, for a small fee, were put in communication with employers.

STATUTES—CONSTRUCTION—CONTEMPORANEOUS CONSTRUCTION. The opinions of the *Attorney General* giving a contemporaneous construction of a statute, while not binding on the courts, may be considered and resorted to.

[1]Reported in 152 Pac. 523.

SAME—PENAL STATUTES. The employment agency law, Laws 1915, p. 1, being penal, a doubt as to whether it applies to the employment of "any person" or merely to "workers" must be resolved in favor of the innocence of the party charged with its violation.

INJUNCTION — RESTRAINING ENFORCEMENT OF STATUTE — RIGHT TO PURSUE BUSINESS. The right to peacèfully pursue an avocation being more than a personal right, a court of equity will enjoin the threatened enforcement of a criminal statute, *malum prohibita* (the employment agency act, Laws 1915, p. 1, making it unlawful to take a fee for securing employment), where plaintiff was the proprietor of an established teacher's employment agency, a business which did not fall within the provisions of the act, and which, if interrupted by criminal prosecutions threatened against him, would be partially if not effectually destroyed; and *Query*, whether the same would not be the case whether a merely personal and not a· property right was involved; nor is it necessary that there be a damage or actual restraint of liberty.

MAIN, FULLERTON, and ELLIS, JJ., dissent.

Appeal from a judgment of the superior court for King county, Mitchell, J., entered March 22, 1915, upon sustaining a demurrer to the complaint, dismissing an action to enjoin the enforcement of the employment agency law, tried to the court. Reversed.

*Joseph P. Totten, Wm. D. Totten, Frank H. Huntworth,* and *E. C. Macdonald,* for appellant.

*The Attorney General* and *L. L. Thompson (C. J. France,* of counsel), for respondents.

*Brightman, Halverstadt & Clarke* and *Cannon & Ferris,* amici curiae.

CHADWICK, J.—Plaintiff brought this action to restrain a threatened arrest and prosecution for alleged violation of initiative measure No. 8, being popularly known as the employment agency law. Prior to the last general election, there was initiated a measure entitled:

"An act to prohibit the collection of fees for the securing of employment or furnishing information leading thereto and fixing a penalty for violation thereof."

Upon the initiation of the measure, the *Attorney General*, as required by law, submitted to the secretary of state a ballot title, in form as follows:

"An act to prohibit the collection of remuneration or fees from workers for the securing of employment or furnishing information leading thereto, and providing a penalty for violation thereof."

This was printed upon each of the ballots and became, under the statute, a notice of the measure and its provisions to the electors of the state. At the general election, the law was adopted. It is in form as follows:

"Be it enacted by the people of the State of Washington:

"Section 1. The welfare of the state of Washington depends on the welfare of its workers and demands that they be protected from conditions that result in their being liable to imposition and extortion.

"The state of Washington therefore exercising herein its police and sovereign power declares that the system of collecting fees from the workers for furnishing them with employment, or with information leading thereto, results frequently in their becoming the victims of imposition and extortion and is therefore detrimental to the welfare of the state.

"Sec. 2. It shall be unlawful for any employment agent, his representative, or any other person to demand or receive either directly or indirectly from any person seeking employment, or from any person on his or her behalf, any remuneration or fee whatsoever for furnishing him or her with employment or with information leading thereto.

"Sec. 3. For each and every violation of any of the provisions of this act the penalty shall be a fine of not more than one hundred dollars and imprisonment for not more than thirty days." Laws 1915, p. 1, ch. 1.

It is alleged by plaintiff that, for many years, he has conducted, by himself and his predecessors in interest, a business known under the trade-name of "Pacific Teachers' Agency;" that the business is successful and remunerative; that its activities are entirely confined to, and that it enjoys the con-

fidence, support and patronage of, school teachers and those either engaged or concerned in educational affairs throughout the states of Washington, Idaho, Oregon, Montana, and the Territory of Alaska, and elsewhere. The character of the business and the manner in which it is conducted is alleged to be as follows:

"That said school teachers have dealt and deal with the plaintiff for the purpose of obtaining employment as school teachers, and use said agency as a medium through and by means of which their qualifications and ability to teach may be enquired into and ascertained by school district officers; and their previous professional records submitted or presented to such officers or to any municipality, school district or other public body desiring to employ teachers for investigation and as a means to facilitate further investigation of their qualifications by such officers or public bodies before entering into contracts of employment.

"That in the performance of services by plaintiff for teachers so seeking employment, he investigates by written or personal communication their professional records and previous standing in the communities where lately employed; solicits on their behalf and receives reports and confidential information from educational institutions and authorities familiar with their scholarship, professional preparation and attainments, experience, character and personal characteristics, for the purpose of determining their fitness and availability for employment as school teachers. That such information so obtained is indexed by plaintiff and kept in a convenient form in suitable record books and preserved permanently for the use and benefit of such persons; for the inspection of employers of teachers; in carrying on correspondence with teachers and prospective employers, and in making or furnishing copies of such records whenever called upon to do so by such teachers or employers. That for such services plaintiff charges and receives in advance a fee of two dollars from each person soliciting his services. That such sum is usually insufficient to defray the actual cost to plaintiff for the services hereinbefore referred to. The teacher agrees to pay 5% of the first year's salary if a situation is obtained."

The business of plaintiff has been conducted under, and is subject to, an ordinance of the city of Seattle entitled:

"An ordinance to license and regulate certain trades and occupations in the city of Seattle, and providing penalties for the violation thereof,".

It is alleged that the defendants, acting in their respective capacities, maintain and contend that plaintiff is guilty of violating the provisions of initiative measure No. 8, and that they declare that they will subject him to arrest and prosecution in the courts of the state. Plaintiff contends that his business is a legitimate business; that it has been carried on and operated in an honest and fair manner, and has contributed to the welfare of the people who deal with and through him; that he has at no time been guilty of any impositions or frauds or extortions, but has rendered faithful and efficient service, to the entire satisfaction of his patrons. These things being true, he insists that initiative measure No. 8 is not, either by its terms or intendments, applicable to his business; and further, if it be so held, that the act is void as in contravention of the constitution of the state of Washington and of the 5th and 14th amendments to the constitution of the United States, in that it deprives plaintiff of his liberty and property without due process of law; that it denies to him the equal protection of the laws, and abridges his privileges and immunities as a citizen of the United States; that it is discriminating and class legislation, and that it is an attempt to regulate interstate commerce.

Plaintiff further alleges that, if arrested and prosecuted for a violation of the act, his business will be irreparably damaged; that he deals only with school teachers, who are peculiarly punctilious in the observance of all law, and his arrest, if published in the newspapers and educational journals throughout the states in which he does business, will work a loss of confidence in him and his business and that his present and possible future patrons will refrain from doing business with him, although his business may finally be held

by the courts to be a lawful business; that, unless his business is carried on without interruption, its efficiency and value cannot be maintained, and that to discontinue it would result in total destruction. These facts come to this court as admitted, the court having sustained a demurrer to the complaint and entered a judgment dismissing plaintiff's action with prejudice.

We are advised by counsel that the court below sustained the demurrer upon the theory that plaintiff's business falls within the prohibitions of initiative measure No. 8, and that the act is a valid exercise of the police power of the state. It is our judgment, after mature reflection, that we are not called upon to pass upon the constitutionality of the law. The case may be decided upon other grounds.

Appellant contends that the law does not include one who is conducting an agency patronized only by teachers and those who employ them; that the act, by its words and intendments, applies only to those who may be classed as "workers" or workmen, and not to those who are engaged in professional service. He submits several definitions of the word "worker" and "workman":

Worker: "One who, or that which, works; a laborer; performer; doer, as a worker in brass; worker of iniquity.

"One who, or that which, works; a laborer; a toiler; a performer.

"One who, or that which, performs work; a toiler."

Workman: "A man employed in labor, whether in tillage or manufactures; a worker; especially a skilled artificer or laborer.

"A laboring man; one who earns his living by manual labor.

"One who labors; one who is employed to do business for another."

Laborer is defined as "one who performs physical or manual labor."

This argument is met by the suggestion that, although the ballot title and section one of the act use the word "work-

ers," they are to be regarded as a preamble to section two, the rule being:

"The preamble to a statute can neither expand nor control the scope and application of the enacting clause, when the latter is clear and explicit." Black, Interpretation of Laws (2d ed.), § 84.

Many authorities are cited to sustain this proposition.

Section two, which, it is said, is the enacting part of the law, uses the words "any person," and, under the rule quoted, we are called upon to hold that the act covers any person who may receive a fee for procuring employment for another or for furnishing any information leading thereto.

Appellant meets this argument, saying that the purpose of the act was to protect laborers and workers only as distinguished from professional men and others, and that the terms and history of the law concur to sustain a judicial declaration that the words "any person" qualify and have reference only to those who take fees from the class designated as "workers" in the ballot title and section one of the act.

We are unable to follow the *Attorney General* in his interpretation of the law. To do so would be to thrust aside all other and equally important rules of statutory construction. While it may be true that the ballot title and section one are in a sense preambulary, they nevertheless go further than to declare merely an evil and a purpose to correct it by legislation. A preamble is, strictly speaking, matter that is descriptive of the purpose of the law, making general reference to its objects. It is,

"A clause at the beginning of a constitution or statute explanatory of the reasons for its enactment and the objects sought to be accomplished." Black, Law Dictionary; 6 Words & Phrases, Title Preamble.

A preamble is not without its uses. It is not to be entirely rejected where the statute is ambiguous, although it will not be resorted to to create a doubt or misunderstanding

which otherwise does not exist. Where there is a doubt, it will be given its place as a component part of the act.

"A preamble is said to be the key of a statute, to open the minds of the makers as to the mischiefs which are to be remedied, and the objects which are to be accomplished by the provisions of the statute." Bouvier, Law Dictionary, Title Preamble.

"When a statute is in itself ambiguous and difficult of interpretation, the preamble may be resorted to." *Den ex dem. James v. DuBois*, 16 N. J. L. 285.

Where the intent of the law is the object of inquiry, it is said that a preamble "discloses the intention of the legislature in enacting the statute." *Hanly v. Sims*, 175 Ind. 345, 93 N. E. 228, 94 N. E. 401.

" 'It is a good means,' says Lord Coke, 'to find out the meaning of the statute, and is a true key to open the understanding thereof.' " Lewis' Sutherland, Statutory Construction (2d ed.), § 341.

Without multiplying authorities or discussing those cited, we think it may be laid down as a general rule that, if there is a broader proposition expressed in the act than is suggested in the preamble, the body or enacting part of the law will prevail over the preamble. But if the body of the act can be given a construction that is consistent with the purpose as declared in the preamble, it will be so construed.

Under these rules, section one is as much a part of the act as sections two and three. It not only defines an evil and a purpose to correct it, but also recognizes and defines a certain class, "workers," as being the object of the law's solicitude and as a class entitled to the protection of the police power. The preamble is not wholly descriptive. It is a declaration of a policy that is intended to advance the police power into a new field, and to bring within its protection a certain class of men, and to make a class amenable to it which has hitherto been unaffected by any law directed specially against it. The finding of necessity coordinates with section

two for the reason that classes are defined. If the law were a general statute applying to all alike, the rule would be as contended.

To limit the declarations of the act to sections two and three would require us to ignore section one, and extend a law which is limited in its scope beyond its clear intent. If thus construed, it might well be questioned whether the law would be constitutional — granting, for present purposes, that the act in whole or in part does no violence to the Fourteenth amendment to the constitution of the United States, a question upon which we make no ruling—for an act of the character of the one now before us, in so far as it affects individuals who may have conducted a legitimate business fairly and honestly, would be clearly unconstitutional, unless it can be said that the abuses growing out of the conduct of a certain kind of a business are so great as to warrant a holding that the general welfare demands that the innocent must limit or give up their calling for the common good. Such laws are sustained, not because a business is in itself unlawful, but because of the abuses attending its operation. Consequently, it is in the abuses and not the business that the law is rooted. The police power touches those things which offend against the welfare of society. It finds no resting place in that which is inoffensive.

If the act be construed as to include "any person" who may accept a fee for procuring employment for another, without qualification, and without reference to the mischiefs declared in the preamble and sought to be remedied by the statute, it would be an unreasonable restraint, and probably be overturned in its entirety.

"The test of the [police] power is found in the effect the pursuit of the calling has upon the public weal, rather than in the inherent nature of the calling itself." *State ex rel. Davis-Smith v. Clausen*, 65 Wash. 156, 192, 117 Pac. 1101, 37 L. R. A. (N. S.) 466.

We have said that, to adopt the theory of the *Attorney General*, we would have to reject other rules of statutory construction. Having met, and as we believe answered, the contention that section one is not to be rejected as a preamble, but to be considered as a guide to the intent and purpose of the law, we shall endeavor to fortify our conclusion by reference to other rules.

Where a new statute is so ambiguous as to incite contrary opinion as to its meanings, the first resort is to discover the antecedent mischief. The mischief inducing the present act is not hard to find. It was to correct what society had come to regard as a wrong practiced upon those who for many reasons were unable to protect themselves against impositions and extortions. It was to protect a class that was powerless under existing conditions to protect itself. As said by the supreme court of the United States in *Patterson v. Bark Eudora*, 190 U. S. 169, when speaking of the Federal statute prohibiting any person from demanding or receiving remuneration for providing employment for sailors:

"The story of the wrongs done to sailors in the larger ports, not merely of the nation but of the world, is an oft-told tale."

Or, as the court of appeals of New York said when considering the constitutionality of a statute regulating employment agencies:

"The legislature had the right to take notice of the fact that such agencies are places where emigrants and ignorant people frequently resort to obtain employment and to procure information. The relations of a person so consulting an agency of this character with the managers or persons conducting it are such as to afford great opportunities for fraud and oppression, and the statute in question was for the purpose of preventing such frauds and, probably, for the suppression of immorality." *People ex rel. Armstrong v. Warden of City Prison*, 183 N. Y. 223, 76 N. E. 11, 2 L. R. A. (N. S.) 859.

The supreme court of Minnesota has noticed particular abuses incident to a class of business and impositions upon its patrons in the same way:

"The nature of the business, and the character of those with whom the business is likely to be conducted, in point of intelligence, experience, and capacity for self-protection from fraudulent practices, are such that it might well be deemed necessary by the legislature, as a matter of proper police regulation . . . The propriety of police regulation seems apparent when it is considered that, by means of such agencies, ignorant and credulous persons might easily be defrauded of their money under a mere pretense of employment to be afforded them in a distant part of the state, so that the fraud would not be discovered until the victim should have gone so far away as to be unlikely to trouble the fraudulent agent by prosecution." *Moore v. Minneapolis*, 43 Minn. 418, 45 N. W. 719.

The history of a law passed in obedience to an expression of public opinion is of value when construing an act or in gathering its intent. *State ex rel. Griffin v. Superior Court*, 70 Wash. 545, 127 Pac. 120. It is a matter of common knowledge that initiative measure No. 8 was aimed at those agencies to which laboring men, as distinguished from professional men, were compelled to resort, and it will not be denied, if agencies like the one conducted by appellant is proscribed, the law which was passed to accomplish one purpose is a drag net for all purposes.

⌐The act has no reasonable relation to any subject other than the protection of those who may be classed as workers or laborers. It has never been contended that business and professional men, teachers, and those following scientific pursuits, are not amply equipped to protect themselves. A teacher renders the very highest class of professional service, whereas, those for whose benefit this law was passed are frequently unskilled in business affairs, and in many instances are men of foreign birth having no competent understanding of our business methods or our language.⌐

Furthermore, the act must be determined by a consideration of its natural effect when put in operation. In operation it may tend to protect the day laborer who, as said by the examiner in the office of the labor commissioner of the city of Seattle, "is generally poor and without means" (*Wiseman v. Tanner*, 221 Fed. 694), and who, in consideration of a fee, is directed to a job which may not exist, or which may not endure because of collusion between the employment agent and a corrupt foreman. But such considerations do not naturally or reasonably follow the case of a teacher when measured by the admitted facts. A teacher is not employed to do day labor. When hired he cannot be "fired at will." He is put in touch with those who may employ him. He is not called upon to make futile trips "into the woods." He arranges his own contract, either in person or by correspondence. His contract is for a term which the law will protect, and he is not subject to the hazards of unemployment by the act of a collusive foreman. The fee for the service rendered, barring a preliminary fee of two dollars to cover cost of enrollment and correspondence, is paid when a contract for a fixed term is secured.

There is another rule of statutory construction to which courts frequently resort, and that is, the rule of cotemporaneous construction. As we have said, the ballot title is a notice of the general purport of an act submitted under the seventh amendment to our constitution. There is nothing in the ballot title that would indicate to the elector that the proposed law would apply to any class other than those engaged in procuring employment or giving information leading to the employment of workers or laborers. It must have so occurred to the *Attorney General* at the time the ballot title was prepared, otherwise some apt words would have been used to suggest that the law applied generally to all who might procure employment or furnish information leading to employment, whatever the character of the patron might be or to whatever class he might belong.

The opinions of the *Attorney General* are always valuable when passing upon questioned statutes, and, although not binding, are always considered and frequently resorted to: *Spokane & Eastern Trust Co. v. Young*, 19 Wash. 122, 52 Pac. 1010; *Hicks v. Young*, 21 Wash. 567, 58 Pac. 1070; *State ex rel. Cowles v. Schively*, 63 Wash. 103, 114 Pac. 901; *Wendt v. Industrial Insurance Commission*, 80 Wash. 111, 141 Pac. 311.

The law is penal. It is well settled that if it is doubtful whether a given act falls within or without a penal statute, the doubt will be resolved in favor of the innocence of the one charged, or who may be charged, with its violation.

"Laws are interpreted in favor of liberty, and if a statute is capable of two constructions, one of which makes a given act criminal and the other innocent, the statute will be given the construction which favors innocence." *State v. Anderson*, 61 Wash. 674, 112 Pac. 931.

See, also, *State ex rel. Dorrien v. Hazeltine*, 82 Wash. 81, 143 Pac. 436; *State v. Furth*, 82 Wash. 665, 144 Pac. 907; *State v. Wilson*, 83 Wash. 419, 145 Pac. 455.

It will not be contended but that it is at least doubtful whether the act was intended to cover a business such as is carried on by appellant.

Although it may be doubtful whether the demurrer properly raised the question, it is submitted that plaintiff cannot maintain this action; that it is contrary to the general rule and the rule as declared by this court in *Brown v. State*, 59 Wash. 195, 109 Pac. 802—that is, that a court of equity has no jurisdiction to review or vacate the judgment of a criminal court or to restrain the execution of a criminal sentence, and these things being so, a court will not restrain the administrative officers of the state when about to subject a citizen to an arrest for the violation of a statute which is alleged to be unconstitutional, or which, it is contended, does not include the complaining party within its inhibitions.

Counsel say:

"We think that the case of *Brown v. State*, 59 Wash. 195, 109 Pac. 802, is decisive of this. In that case this court held that it would not enjoin the enforcement of a statute relating to the practice of dentistry, alleged to be unconstitutional, because the right to practice dentistry is not a property right. If this be true, much less can the right to charge fees for securing employment for persons be considered a property right. It is merely a personal right, and therefore not the subject of equity jurisdiction."

With the *Brown* case and the authorities upon which it rests before us, this court held, in *City Cab, Carriage & Transfer Co. v. Hayden*, 73 Wash. 24, 131 Pac. 472, Ann. Cas. 1914 D. 731, that one who was threatened with an arrest under a city ordinance might bring a proceeding in equity to test by way of injunction the validity of a police regulation.

Counsel for the state seek to distinguish and harmonize these two opinions thus: first, in the *Hayden* case it was sought to enjoin the enforcement of a municipal ordinance; second, the exception noted in the *Brown* case, that is, irreparable injury to property rights, should be considered as necessary to the application of the rule there stated. Such conclusions do not follow. We find no real distinction in the authorities between the rules applying in cases brought to enjoin prosecutions under a city ordinance and cases brought to test the validity of a statute. 22 Cyc. 903. Nor can we think of any real distinction. In either case, it is generally held that such a suit will not be entertained unless a civil or property right is involved. The cases are collected in 21 L. R. A. 84; 2 L. R. A. (N. S.) 631; 25 L. R. A. (N. S.) 193, and 34 L. R. A. (N. S.) 454.

Nor do we agree with counsel that plaintiff is concerned only in the preservation of a personal right and that no right of property is involved. Whatever the law may have been, it must be construed with reference to its present developments

and existing social conditions. We can readily understand why a court of equity would refuse to restrain a prosecution under a penal statute where the rights of the party had accrued after the enactment of the statute, or the questioned law is not merely *malum prohibitum* but *malum in se.* But  in these modern times, when the activities of the state have been so greatly and so rapidly extended that almost all forms of business which have been and are now regarded as legitimate have been made the subject of state control and regulation, it would seem that no man should be denied the privilege of testing a law that touches him in his rights to pursue the business to which he has devoted his time and energies and in which his capital is invested, by anticipating an arrest which must surely follow if the officers of the state perform the duties imposed upon them.

The right to pursue any lawful business calling, subject to proper regulation and control, or, in other words, the police power, is a right guaranteed by the 14th amendment to the constitution of the United States. *Murphy v. California,* 225 U. S. 623.

"The liberty mentioned in that amendment means not only the right of the citizen to be free from the mere physical restraint of his person, as by incarceration, but the term is deemed to embrace the right of the citizen to be free in the enjoyment of all his faculties; to be free to use them in all lawful ways; to live and work where he will; to earn his livelihood by any lawful calling; to pursue any livelihood or avocation, and for that purpose to enter into all contracts which may be proper, necessary and essential to his carrying out to a successful conclusion the purposes above mentioned." *Allgeyer v. Louisiana,* 165 U. S. 578, 589.

The holdings of this court are strictly in accord with the idea that the right to peacefully pursue an avocation is more than a personal right. In *Hillman v. Seattle,* 33 Wash. 14, (73 Pac. 791,) it was said:

"It seems to us, however, that a person who has valuable property rights at stake ought not to be required or expected

to submit to the odium of being dragged into a criminal court before being permitted to take steps to protect these rights."

Coming to the case at bar, we have a business that is legitimate; that performs a necessary function, for surely we may take notice that the propaganda in furtherance of the present law carried with it the suggestion and hope that the necessity for employment agencies would be met and cared for by bureaus conducted by municipalities and the state government. By the terms of the law, the act of conducting an employment agency is not interdicted as criminal. It may still be carried on, subject only to the restraint that no fees shall be taken from the employee for securing employment or giving information leading to employment. Having then a proprietorship in a legitimate business to which his time and energies have been devoted and which, if interrupted by a lapse incident to criminal prosecutions, would be partially if not effectually destroyed, it would seem that the right of appellant, under any construction of the law, is more than a right of liberty, and that a court should not regard it in a technical way, but from the broad viewpoint of the consequences of the threatened invasion.

In so far as the writer of this opinion is concerned, he is not disposed to draw any refined distinctions between personal and property rights. If the right of a professional man or one engaged in a business depending upon personal attention, educational qualifications, or peculiar fitness for the work at hand, to pursue a legitimate avocation, or to practice his profession, is involved, I would be perfectly willing to hold that the mere right to pursue such business or profession is a right that will be protected by the courts, albeit there are some who may say that such right is personal.

To say that a man who runs a grocery store, or a public service corporation operating under a franchise, can invoke the aid of equity to protect civil or property rights, and that a professional man, or one conducting a business requiring

no capital in money, is not entitled to the protection of the law, is inconsistent and unsound. Under the authorities, the one may come into a court of equity and secure relief. Under the weight of authority, the other cannot. If the law be a progressive science—and we have frequently asserted that it is—it would seem that the professional man, or the man with no capital, who has hitherto committed no offense against the laws of the state and whose business or profession is not inherently vicious, or one who is performing a necessary service to society, should not be put to the harassment or the annoyance or disgrace of an arrest under a statute which has been passed while he was thus engaged and which, if enforced, would destroy his business and deprive him of his means of livelihood. In such a case, I confess my utter inability to draw a distinction between a personal and a property right. I find no sound reasons in the books for declaring that a man must become a potential criminal before he can test a law that by its letter denies his right to do that which, but for the new dispensation, has been recognized by all men as lawful.

Nor does this reasoning lead us into the mire or baffle us to answer the question put by the *Attorney General*, "If a man conceives that he is about to be arrested for murder would a court of equity issue an injunction to test the law." Clearly it would not, for murder is a crime by all law, human and divine. It is *malum in se*. It is vastly different when a peaceful, respected and industrious citizen goes to bed an innocent man, and wakes to find himself and his business under the shadow of a statute that outlaws his business and makes him a possible criminal if he pursues it. If the time has not yet come, it is time the courts should cease from saying that no man shall be denied the right to protect his liberty when threatened under a statute *malum prohibita*, unless it can be said at the same time that he has suffered a deprivation of property rights or of property loss. Such a holding would be in complete accord with modern tendencies. This tendency found peculiar emphasis in the industrial insurance act, and

in other humane laws which have been passed by our own legislature.   There is an old maxim,

"*Cessante ratione legis, cessat et ipsa lex.*   The reason of the law ceasing, the law itself ceases also.   Co. Litt. 70b; 2 Bl. Comm. 390, 391; Broom, Max. 159." Black, Law Dictionary, 185.

The reason for the rule that would deny a man the right to question the constitutionality of a law by a proceeding in injunction to prevent an arrest or to restrain criminal proceedings came from the lack of relation between equity and law courts as they formerly existed in England.   The reason that courts of equity have refused to interfere is that they had no jurisdiction to enforce their decrees without invading the jurisdiction of another court.   High, Injunctions (4th ed.), § 68.   No such distinction now remains.   While we preserve, in a certain sense, proceedings in equity and actions at law, these distinctions do not touch anything other than the form of trial and the procedure.   The remedy, whatever it is, is to be found in the same court.   We have elaborated this thought in many cases: *In re Sall*, 59 Wash. 539, 110 Pac. 32, 626, 140 Am. St. 885); *Sloan v. West*, 63 Wash. 623, 116 Pac. 272); *In re Martin's Estate*, 82 Wash. 226, 144 Pac. 42.

The old jealousies which maintained a bar of distrust between law courts and equity courts no longer exist, for the province of the judge and the discretion of the chancellor are combined in the one person.   No question of substantive law is involved.   The only question is the one of procedure, or how can the right be determined.   It would be to render obeisance to the image of a dead legal form and practice to say to a man, if you are damaged in property we will hear you in equity, and, if it be so, declare the law which confounds you unconstitutional; but if your liberty only is at stake, although it may be dearer to you than your property, you must go out of the equity door of the court, receive submissively the odium and disgrace of an arrest, and reenter by way of the law door of the same court.   If you do this we will hear you, and if the

law under which you have been arrested is unconstitutional, we will so declare. We will then, and then only, permit you to go hence, free to do as you will, with the handicap of a tarnish upon your good name. Such an argument finds no response in the chambers of abstract reason, nor does the reason that formerly sustained it exist in our present court system, nor can it, from the very nature of things, exist. *Cessante ratione legis, cessat et ipsa lex.*

Neither are we impressed with the suggestion that, although the rule be admitted, courts will not entertain a case of this kind until there be a damage or an actual restraint of liberty. To bring a case to this court to test the constitutionality of laws has become a constant practice. They are brought here by the officers of the state, by individual litigants, and by the connivance—and we use the word in no derogatory sense—of the state and the individual. We have accomplished by an accepted practice what has been done by the legislature or by constitutional amendment in some of the other states, notably in the state of Massachusetts, where laws are submitted for the opinion of the judges prior to the time of their final passage by the legislature. In most of the cases of the kind to which we have referred, we know, as everyone knows, no real controversy has arisen, and that the object of the suit is to take the opinion of this court. In recent years we have passed upon the constitutionality of laws in what may be truthfully declared to be agreed cases, scores of times, the most prominent instance being in the case of *State ex rel. Davis-Smith Co. v. Clausen*, 65 Wash. 156, 117 Pac. 1101, 37 L. R. A. (N. S.) 466, where, with nothing before us but the question of whether the law, not yet in operation was constitutional, we anticipated it and went into every phase of the law of the case.

If the state can do these things, or accept the practice when adopted by others, is there any sound reason why the citizen cannot proceed in the same way when his liberty is at stake? The question cannot be answered in the negative without a

charge of inconsistency. It is no answer to say that a party has no interest until arrested. He has the same interest. If the execution of the questioned law would operate to deprive him of his liberty, or if his arrest would interrupt or destroy a business theretofore lawful, it is neither logical nor praiseworthy on the part of the state to put the burden of arrest and possible imprisonment, pending a trial, upon one who has the admitted right to question the constitutionality of the law if it were a question of property right only. To longer hold to this rule is but to enrich the already fertile field of misunderstanding as to the ways of courts and their procedure, and to put courts to the labor of drawing the fine distinctions between property rights and the right of personal liberty, and the one as an incident to the other, as in many of the cases collected in 22 Cyc. 903, note 37.

We conclude, therefore, that the acts of appellant and the business conducted by him are not within the terms or intendments of initiative measure No. 8, and that the court has jurisdiction to restrain the threatened prosecution. Whether the law is a proper exercise of the police power as to those falling within its terms, we pass no opinion.

Reversed, and remanded with instructions to enter a perpetual injunction.

MORRIS, C. J., HOLCOMB, PARKER, and MOUNT, JJ., concur.

MAIN, J. (dissenting)—I am unable to concur in the views expressed in the majority opinion. Section 2 of the act provides that it shall be unlawful for "any employment agent" to receive or demand from "any person" a fee for furnishing such person with employment. This language is so plain as not to call for construction. It is obvious that the appellant comes within the terms of the act. It is true that § 1 of the act, which is in the nature of a preamble and declares the general policy of the state, uses the word "workers," but to limit the meaning of the word "work" to those who perform

physical labor is not sustained by the lexicographers defining the term nor is it the common understanding of its meaning. The word "workers." as used in § 1, even though given the limited meaning, should not modify the plain language used in the operative section of the statute.

FULLERTON and ELLIS, JJ., concur with MAIN, J.