[No. 13441. Department One. December 5, 1916.]

The State of Washington, *Respondent*, v. George P.

Rossman, *Appellant*.[1]

STATUTES—CONSTRUCTION—"WORKER." A stenographer and book-keeper is a "worker" within the meaning of initiative measure No. 8 (Rem. 1915 Code, § 6565-1 *et seq.*) making it unlawful for employ-ment agencies to charge a fee or remuneration for furnishing em-ployment to "workers."

SAME—VALIDITY—DEFINITENESS—"WORKERS." The word "worker" in initiative measure No. 8 (Rem. 1915 Code, § 6565-1 *et seq.*) mak-ing it unlawful for employment agencies to charge a fee, or remuner-ation for furnishing employment to "workers," is not so indefinite as to render the act void or so wanting in certainty that it could not support a criminal charge for its violation.

CONSTITUTIONAL LAW—POLICE POWER—REGULATION OF BUSINESS—EMPLOYMENT AGENCIES. It is within the police power of the state to prohibit employment agencies from charging any fee or remuner-ation for furnishing employment to workers, and initiative measure No. 8 (Rem. 1915 Code, § 6565-1 *et seq.*) is therefore not unconstitu-tional as in violation of the fifth and fourteenth amendments to the Federal constitution.

Appeal from a judgment of the superior court for King county, Ronald, J., entered March 3, 1916, upon a trial and conviction of violating the employment agency law. Affirmed.

*Edgar S. Hadley*, for appellant.

*Alfred H. Lundin* and *Lane Summers*, for respondent.

Mount, J.—The defendant was convicted of the crime of charging a fee for furnishing employment or information leading thereto. He has appealed from the sentence imposed upon that conviction.

The facts are stipulated in substance as follows: The de-fendant was operating an agency for the employment of stenographers and bookkeepers, and was charging a fee of two dollars as an enrollment fee, and twenty per cent of the

[1]Reported in 161 Pac. 349.

first month's salary after the applicant secured employment. On the 14th day of February, 1916, the appellant demanded and received from one Elnora Hughes the sum of two dollars. She was then seeking employment as a stenographer and bookkeeper.

The appellant makes three contentions in this court, to the effect: First, That a stenographer and bookkeeper is not a worker within the meaning of initiative measure No. 8 (Rem. 1915 Code, § 6565-1 et seq.). Second, That the word "worker" is so indefinite as to render the act void. And third, That the act is unconstitutional under the fifth and fourteenth amendments to the constitution of the United States, and like provisions of the constitution of this state. We shall notice these contentions briefly.

On the first point, the appellant relies upon the case of *Huntworth v. Tanner*, 87 Wash. 670, 152 Pac. 523, where we held that a school teacher was not a worker within the meaning of that act. In that case, at page 680, we said:

"The act has no reasonable relation to any subject other than the protection of those who may be classed as workers or laborers. It has never been contended that business and professional men, teachers, and those following scientific pursuits, are not amply equipped to protect themselves. A teacher renders the very highest class of professional service, whereas, those for whose benefit this law was passed are frequently unskilled in business affairs, and in many instances are men of foreign birth having no competent understanding of our business methods or our language."

It is contended by the appellant that a stenographer and bookkeeper, for the reasons stated in *Huntworth v. Tanner, supra*, is not included within the meaning of the term "worker." Some things there said might lead to that conclusion. But we are satisfied that a stenographer and bookkeeper is a worker and, therefore, comes within the meaning of the act (Rem. 1915 Code, § 6565-1 et seq.).

In Georgia, in a case where a man was employed as a private secretary and stenographer to the president of a rail-

road and banking company at $125 per month, his duties being to receive dictation and transcribe letters, and to take care of the papers in the office, including the keeping of books and statements, it was held that he was a worker, and was entitled to have his wages exempt from garnishment. *Abrahams v. Anderson,* 80 Ga. 570, 5 S. E. 778, 12 Am. St. 274. And in *Cohen v. Aldrich,* 5 Ga. App. 256, 62 S. E. 1015, also a Georgia case, a stenographer was also held to be a worker. In that case it was said:

"That a stenographer is skilled and trained cannot affect the nature of the work he does, although it does affect its character. After acquiring the trade, the test is the method of carrying it on. It is difficult to conceive of anything more thoroughly manual than the work of a stenographer. Receiving the sounds from the lips of another, he registers what he hears and reproduces what he receives. He exercises no independence of thought, no initiative, no discretion. The test of his efficiency is his absolute acceptance of what is given him and its return unchanged. If his employer indulges in the pastime of murdering the King's English, he must become a 'particeps criminis,' and join in the assassination. So pronouncedly are the physical faculties involved in stenography that there comes a time when the hand refuses to work, although the mental faculties may be entirely clear. It is pre-eminently manual labor, work of the hand."

Under the rule in these cases, and others of a similar character which might be cited, we are satisfied that a stenographer and bookkeeper is a worker within the common acceptation of that term, and is within the meaning of initiative measure No. 8 (Rem. 1915 Code, § 6565-1 *et seq.*).

It is next contended that the term "worker" is so indefinite as to render the act void. This contention is based upon the decision in *State v. Powles & Co.,* 90 Wash. 112, 155 Pac. 774. In that case, we held that the term "commission merchant," which was defined to be "any person, firm, or corporation whose principal business is the sale of farm, dairy, orchard or garden produce on account of the shipper or consignor," was too indefinite to base a criminal charge upon by

reason of the use of the words "principal business." But it was not held there that the words "commission business," if they had been used alone, were not capable of accurate definition. But because the word "principal" was used, it was held that it could not be determined with accuracy what the principal business of a commission merchant might be.

The word "worker" is capable of definite definition and is readily understood. We think there is no merit in the contention that the act is void for indefiniteness because of the use of the word "worker."

It is next contended that the act is unconstitutional because it is not within the police power of the state to regulate or interfere with the right of a private citizen to pursue a lawful business. In the case of *Huntworth v. Tanner, supra*, we reserved the constitutional question because, in that case, it was not necessary to determine that question, for we held that a school teacher was not a worker within the meaning of the act. The question now presented is whether this act is within the police power of the state.

A number of cases are cited by the appellant to the effect that a citizen is guaranteed the protection of his property and the pursuit of his happiness under the constitution of the United States, and that any person is at liberty to pursue any lawful calling, and to do so in his own way when not encroaching upon the rights of others; and it is contended that the police power of the state does not extend to the right to take away or regulate a lawful business. There can be no doubt of the right of a citizen to pursue a lawful calling in a lawful way. But it is equally true that there can be no doubt of the right of the state, through its legislature, to regulate a business which may become unlawful by improper and unlawful means.

In *Munn v. Illinois*, 94 U. S. 113, at page 124, it was said:

"When one becomes a member of society, he necessarily parts with some rights or privileges which, as an individual not affected by his relations to others, he might retain. . . .

From this source come the police powers, which, as was said by Mr. Chief Justice Taney in the *License Cases*, 5 How. 583, 'are nothing more or less than the powers of government inherent in every sovereignty, . . . that is to say, . . . the power to govern men and things.' Under these powers the government regulates the conduct of its citizens one towards another, and the manner in which each shall use his own property, when such regulation becomes necessary for the public good."

In *State v. Mountain Timber Co.*, 75 Wash. 581, 135 Pac. 645, this court said:

"Having in mind the sovereignty of the state, it would be folly to define the term. To define is to limit that which from the nature of things cannot be limited, but which is rather to be adjusted to conditions touching the common welfare, when covered by legislative enactments. The police power is to the public what the law of necessity is to the individual. It is comprehended in the maxim *salus populi suprema lex*. It is not a rule, it is an evolution."

In *State v. Pitney*, 79 Wash. 608, 140 Pac. 918, Ann. Cas. 1916 A 209, in discussing the police power of the state, this court said:

"If a state of facts can reasonably be presumed to exist which would justify the legislation, the court must presume that it did exist and that the law was passed for that reason. If no state of circumstances could exist to justify the statute, then it may be declared void because in excess of the legislative power."

And in *Munn v. Illinois, supra*, at page 132 of 94 U. S., the supreme court of the United States said:

"For our purposes we must assume that, if a state of facts could exist that would justify such legislation, it actually did exist when the statute now under consideration was passed. For us the question is one of power, not of expediency. If no state of circumstances could exist to justify such a statute, then we may declare this one void, because in excess of the legislative power of the state. But if it could, we must presume it did. Of the propriety of legislative interference

within the scope of legislative power, the legislature is the exclusive judge."

And in *McLean v. Arkansas*, 211 U. S. 539, at page 548, it was said:

"If there existed a condition of affairs concerning which the legislature of the state, exercising its conceded right to enact laws for the protection of the health, safety or welfare of the people, might pass the law, it must be sustained; if such action was arbitrary interference with the right to contract or carry on business, and having no just relation to the protection of the public within the scope of legislative power, the act must fail."

In *State ex rel. Davis-Smith Co. v. Clausen*, 65 Wash. 156, 177, 117 Pac. 1101, 37 L. R. A. (N. S.) 466, we said:

"The test of the validity of such a law is not found in the inquiry, Does it do the objectionable thing? but is found rather in the inquiry, Is there no reasonable ground to believe that the public safety, health or general welfare is promoted thereby? The legislature cannot, of course, without violating this clause of the constitution, declare a particular industry, commonly engaged in by the people, to be unlawful which, under all circumstances, must necessarily be harmless and innocent; but it can regulate and control and prohibit any industry, however innocent it may have been in its inception, whenever it becomes a menace to the employees engaged in it, the people surrounding it, or to any considerable number of the people at large, no matter from whatsoever cause the menace may arise."

We think there can be no doubt of the principles enunciated in the foregoing quotations. In the *Huntworth* case, *supra*, the reason for this act was pointed out. We there said, at page 679:

"The mischief inducing the present act is not hard to find. It was to correct what society had come to regard as a wrong practiced upon those who for many reasons were unable to protect themselves against impositions and extortions. It was to protect a class that was powerless under existing conditions to protect itself. As said by the supreme court of the United States in *Patterson v. Bark Eudora*, 190 U. S.

169, when speaking of the Federal statute prohibiting any person from demanding or receiving remuneration for providing employment for sailors:

" 'The story of the wrongs done to sailors in the larger ports, not merely of the nation but of the world, is an oft-told tale.'

"Or, as the court of appeals of New York said when considering the constitutionality of a statute regulating employment agencies:

" 'The legislature had the right to take notice of the fact that such agencies are places where emigrants and ignorant people frequently resort to obtain employment and to procure information. The relations of a person so consulting an agency of this character with the managers or persons conducting it are such as to afford great opportunities for fraud and oppression, and the statute in question was for the purpose of preventing such frauds and, probably, for the suppression of immorality.' *People ex rel. Armstrong v. Warden of City Prison*, 183 N. Y. 223, 76 N. E. 11, 2 L. R. A. (N. S.) 859."

And quoting from *Moore v. Minneapolis*, 43 Minn. 418, 45 N. W. 719, we said:

" 'The nature of the business, and the character of those with whom the business is likely to be conducted, in point of intelligence, experience, and capacity for self-protection from fraudulent practices, are such that it might well be deemed necessary by the legislature, as a matter of proper police regulation . . . The propriety of police regulation seems apparent when it is considered that, by means of such agencies, ignorant and credulous persons might easily be defrauded of their money under a mere pretense of employment to be afforded them in a distant part of the state, so that the fraud would not be discovered until the victim should have gone so far away as to be unlikely to trouble the fraudulent agent by prosecution.' "

We then said:

"Furthermore, the act must be determined by a consideration of its natural effect when put in operation. In operation it may tend to protect the day laborer who, as said by the examiner in the office of the labor commissioner of the city

of Seattle, 'is generally poor and without means' (*Wiseman v. Tanner*, 221 Fed. 694), and who, in consideration of a fee, is directed to a job which may not exist, or which may not endure because of collusion between the employment agent and a corrupt foreman."

It is apparent, from these quotations from *Huntworth v. Tanner*, *supra*, that the act, and the purposes for which it was enacted, were to prevent frauds which had become common in the class of business to which the act relates, and was, therefore, under the authorities above cited, within the police power of the state to regulate, and even suppress, to the extent, at least, of the frauds. The constitutionality of this act was upheld in *Wiseman v. Tanner*, 221 Fed. 694, where all the authorities cited in the appellant's brief, and many not therein cited, were considered.

It is further argued by the appellant that the act is prohibitive of the business, and therefore is unconstitutional. This contention, we think, is without merit, because the act does not prohibit the business. Section 2 of the act, Laws of 1915, p. 1 (Rem. 1915 Code, § 6565-2), makes it unlawful for any employment agent to demand or receive fees from persons seeking employment. It does not prohibit the business. Fees, of course, may be charged against persons desiring to employ laborers. We are of the opinion that the act is a valid exercise of the police power, and is not unconstitutional upon either ground.

The judgment appealed from is therefore affirmed.

MORRIS, C. J., CHADWICK, and FULLERTON, JJ., concur.

ELLIS, J., concurs in the result.