[No. 39863. En Banc. October 23, 1969.]

PETSTEL, INC., *Appellant*, v. THE COUNTY OF KING *et al.*, *Respondents.**

*Reported in 459 P.2d 937.

146

*Comfort, Dolack, Hansler & Billett (John F. Hansler,* of counsel), for appellant.

*Charles O. Carroll, James E. Kennedy, Richard M. Ishikawa,* and *James E. Deno,* for respondents.

*Robert J. Mc Kanna,* amicus curiae.

NEILL, J.—This is an appeal from a decree upholding the validity of a King County resolution fixing maximum rates to be charged by employment agencies.

On December 12, 1966, the King County Board of Commissioners passed resolution No. 32792 regulating employment agencies. The resolution contains provisions requiring bonds, licenses and records, prohibiting charges on the promise of future work, prohibiting division of fees, and established a schedule of maximum fees which could be charged clients by employment agencies.

The resolution was passed after a public hearing at which proponents and opponents of the proposed resolution, including plaintiff, were allowed to present views. The commissioners had letters from employment agencies objecting to the fee structure set by a prior resolution (which contained lower maximum rates than the resolution now in

question). There was one letter from an agency approving the rates adopted by resolution No. 32792. The county had also received an unspecified number of citizen complaints about excessive charges by employment agencies. Other than this hearing, the county conducted no special investigation of rates charged by employment agencies, and, so far as appears from the record, the above material was all that was available to the commissioners when considering the resolution.

Plaintiff brought this declaratory judgment action seeking a decree that the resolution is unconstitutional and for a permanent injunction against its enforcement. Findings of fact and conclusions of law were entered after trial which, insofar as relevant to this appeal, concluded (1) that the county may, in the exercise of its police power, regulate employment agencies; (2) that the resolution's provision fixing maximum rates is a reasonable exercise of this power; (3) that the rates set were not patently unreasonable; (4) that the resolution did not conflict with general laws; (5) that the resolution is not discriminatory against plaintiff or employment agencies as a class; and (6) that resolution No. 32792 is valid and constitutional. Accordingly, the relief sought by plaintiff was denied.

Plaintiff's primary contention is that the King County resolution fixing maximum rates for employment agencies violates the due process clause of U.S. Const. amend. 14 and Const. art. 1, § 3. The validity of the resolution as a regulation of a private business must rest upon the police power delegated to the counties by Const. art. 11, § 11:

> Any county, city, town or township may make and enforce within its limits all such local police, sanitary and other regulations as are not in conflict with general laws.

■ The early view of the due process limitations upon the states' power to regulate prices is exemplified by *Ribnik v. McBride*, 277 U.S. 350, 72 L. Ed. 913, 48 S. Ct. 545, 56 A.L.R. 1327 (1928). It was there held that a price-fixing regulation, in order to be valid, must concern a business "affected with a public interest." (p. 355.) To be affected

with a public interest, a business must have been devoted to a public use "and an interest in effect granted to the public in that use." An employment agency was not deemed to be such a business and a New Jersey. law regulating the fees charged by these agencies was declared unconstitutional.

Within 6 years after *Ribnik,* the United States Supreme Court began a retreat from this view of due process. A New York statute fixing the minimum and maximum retail prices of milk was upheld in *Nebbia v. New York,* 291 U.S. 502, 78 L. Ed. 940, 54 S. Ct. 505, 89 A.L.R. 1469 (1934). A Washington statute authorizing the setting of minimum wages for minors and women was upheld in *West Coast Hotel Co. v. Parrish,* 300 U.S. 379, 81 L. Ed. 703, 57 S. Ct. 578, 108 A.L.R. 1330 (1937). A Georgia statute setting maximum warehouse rates for leaf tobacco was approved in *Townsend v. Yeomans,* 301 U.S. 441, 81 L. Ed. 1210, 57 S. Ct. 842 (1937). The price fixing provisions of the Bituminous Coal Act of 1937 were upheld in *Sunshine Anthracite Coal Co. v. Adkins,* 310 U.S. 381, 84 L. Ed. 1263, 60 S. Ct. 907 (1940). The minimum wage and maximum hour provisions of the Fair Labor Standards Act of 1938 were upheld in *United States v. Darby,* 312 U.S. 100, 85 L. Ed. 609, 61 S. Ct. 451, 132 A.L.R. 1430 (1941).

This decline of due process limitations and consequent expansion of the police power was noted by this court as early as 1936 in *Shea v. Olson,* 185 Wash. 143, 154, 53 P.2d 615, 111 A.L.R. 998 (1936):

> While, formerly, the power was viewed as one of strict and direct application, it has now come to be more favored on account of changed and changing economic and social conditions, and at present is frequently relied on to sustain laws which affect the common good in only an indirect way. . . . A large discretion is therefore vested in the legislature to determine what the public interest demands and what measures are necessary to secure and protect the same.

This more permissive view of the due process clause as it affects price regulation resulted in a reappraisal of the "af-

fected with a public interest" concept. This was fully discussed in *Nebbia v. New York, supra,* at 531:

> But we are told that because the law essays to control prices it denies due process. Notwithstanding the admitted power to correct existing economic ills by appropriate regulation of business, even though an indirect result may be a restriction of the freedom of contract or a modification of charges for services or the price of commodities, the appellant urges that direct fixation of prices is a type of regulation absolutely forbidden. His position is that the Fourteenth Amendment requires us to hold the challenged statute void for this reason alone. The argument runs that the public control of rates or prices is *per se* unreasonable and unconstitutional, save as applied to businesses affected with a public interest; that a business so affected is one in which property is devoted to an enterprise of a sort which the public itself might appropriately undertake, or one whose owner relies on a public grant or franchise for the right to conduct the business, or in which he is bound to serve all who apply; in short, such as is commonly called a public utility; or a business in its nature a monopoly.
>
> We may as well say at once that the dairy industry is not, in the accepted sense of the phrase, a public utility. We think the appellant is also right in asserting that there is in this case no suggestion of any monopoly or monopolistic practice. . . . But if, as must be conceded, the industry is subject to regulation in the public insterest, what constitutional principle bars the state from correcting existing maladjustments by legislation touching prices? We think there is no such principle. . . . "Property does become clothed with a public interest when used in a manner to make it of public consequence, and affect the community at large" . . . Thus understood, "affected with a public interest" is the equivalent of "subject to the exercise of the police power"; and it is plain that nothing more was intended by the expression.

With respect to employment agencies, this change in view culminated in *Olsen v. Nebraska ex rel. Western Reference & Bond Ass'n,* 313 U.S. 236, 85 L. Ed. 1305, 61 S. Ct. 862, 133 A.L.R. 1500 (1941). The court noted that "affected with a public interest" can mean "no more than that

an industry, for adequate reason, is subject to control for the public good", citing *Nebbia v. New York, supra.* It was then held that the federal constitution did not proscribe a Nebraska statute limiting the maximum fees to be charged by employment agencies.[1]

Plaintiff asks us to distinguish *Olsen v. Nebraska, supra,* contending it was decided in the aftermath of the depression of the 1930's when there may have been facts which justified price fixing which do not now exist. Plaintiff argues that *Olsen* must be read in conjunction with the chronicle of employment agency abuses contained in Mr. Justice Stone's dissent in *Ribnik v. McBride, supra,* at 365-70. It is contended that most of plaintiff's customers are already employed; that fierce competition among employment agencies and competition with free state and federal employment agencies prevents abuses; and that neither the county commissioners nor the trial court had evidence that this regulation was justified.

These arguments are basically that a price regulation must be justified by facts which appear in the record or of which courts can take judicial notice; and that the facts then prevailing justified the regulation in *Olsen,* but do not do so now. The rationale in the *Olsen* opinion, however, negates this contention. The court in *Olsen,* in response to some of the same arguments now made by plaintiff, stated explicitly that there is no requirement that a legislative body factually justify their price regulation:

> But respondents maintain that the statute here in question is invalid for other reasons. They insist that special circumstances must be shown to support the validity of such drastic legislation as price-fixing, that the executive, technical and professional workers which respondents serve have not been shown to be in need of special protection from exploitation, that legislative limitation of

[1]The Supreme Court did not pass upon the reasonableness of the fees set. Upon remand to the Nebraska Supreme Court, it was held that the fees set were unreasonable, and that this type of legislation was prohibited by the Nebraska State Constitution. *Boomer v. Olsen,* 143 Neb. 579, 10 N.W.2d 507 (1943). *But see* Annot., 20 A.L.R.3d 599, 612 (1968).

maximum fees for employment agencies is certain to react unfavorably upon those members of the community for whom it is most difficult to obtain jobs, that the increasing competition of public employment agencies and of charitable, labor union and employer association employment agencies have curbed excessive fees by private agencies, and that there is nothing in this record to overcome the presumption as to the result of the operation of such competitive, economic forces. And in the latter connection respondents urge that, since no circumstances are shown which curb competition between the private agencies and the other types of agencies, there are no conditions which the legislature might reasonably believe would redound to the public injury unless corrected by such legislation.

We are not concerned, however, with the wisdom, need, or appropriateness of the legislation. Differences of opinion on that score suggest a choice which "should be left where . . . it was left by the Constitution—to the States and to Congress." *Ribnik v. McBride, supra,* at p. 375, dissenting opinion. There is no necessity for the state to demonstrate before us that evils persist despite the competition which attends the bargaining in this field.

*Olsen v. Nebraska, supra,* at 246.

■ Plaintiff's argument on the lack of need for this legislation and the restrictions which it imposes on a legitimate business which is neither a monopoly nor dependent upon use of public rights of way must be addressed to the legislative branch of government. It is the function of the judiciary to test legislation against constitutional restrictions. Courts do not review the wisdom of legislative acts or the policy contained therein.

■ The county commissioners must be presumed to be in touch with the conditions in King County. They were elected upon local platforms and are constantly dealing with local problems. There is no constitutional rule which requires that they conduct a special investigation or make formal findings before they exercise their police power. *See Townsend v. Yeomans, supra,* at 451. We have followed the same principle. If a state of facts which would justify the

legislation can reasonably be conceived to exist, courts must presume it did exist and the legislation was passed for that purpose. There is no requirement that the court find facts justifying the legislation. *Spokane v. Carlson,* 73 Wn.2d 76, 436 P.2d 454 (1968); *Lenci v. Seattle,* 63 Wn.2d 664, 388 P.2d 926 (1964); *Clark v. Dwyer,* 56 Wn.2d 425, 353 P.2d 941 (1960); *Campbell v. State,* 12 Wn.2d 459, 122 P.2d 458 (1942); *Shea v. Olsen, supra.*

We can reasonably conceive of a state of facts which would justify regulation of the rates charged by employment agencies. These agencies occupy a somewhat unique position in the marketplace. The consumers of the service offered by employment agencies are often without present employment. This lack of a job, even if it has only been for a short time, may reduce the applicant's bargaining power to almost nothing. He must find work and the income it provides, and is in no position to object to the rates charged. Furthermore, competition among employment agencies might well center around "who has what position listed," rather than the rates charged. Thus it is easy to conceive of a situation where the rates charged by employment agencies may become abusive, and regulation of the maximum rates charged by these agencies is a means substantially directed toward curbing this abuse.

■ For these reasons both this court and the United States Supreme Court have long recognized that employment agencies are subject to police power regulations. *See Olsen v. Nebraska, supra; Brazee v. Michigan,* 241 U.S. 340, 60 L. Ed. 1034, 36 S. Ct. 561 (1915); *State v. Rossman,* 93 Wash. 530, 161 P. 349 (1916); *Spokane v. Macho,* 51 Wash. 322, 98 P. 755 (1909).

■ If it is a means substantially directed toward curbing an abuse at which the police power is legitimately directed, then a resolution fixing maximum fees is no different than any other exercise of the police power. Due process only demands that the law shall not be unreasonable, arbitrary or capricious. *Nebbia v. New York, supra.* If there is an abuse in an area where the public has a legiti-

mate interest in regulation, and price regulation reasonably tends to correct this abuse, then such regulation by the legislative branch of government is constitutionally permissible under the police power. As stated in *Nebbia v. New York, supra,* at 532:

The due process clause makes no mention of sales or of prices any more than it speaks of business or contracts or buildings or other incidents of property. The thought seems nevertheless to have persisted that there is something peculiarly sacrosanct about the price one may charge for what he makes or sells, and that, however able to regulate other elements of manufacture or trade, with incidental effect upon price, the state is incapable of directly controlling the price itself. This view was negatived many years ago.

Once a business is conceded to be subject to regulation, the wisdom, necessity or expediency of the particular legislative enactment is not subject to judicial review. *Treffry v. Taylor,* 67 Wn.2d 487, 408 P.2d 269 (1965), and cases cited therein.

Therefore, plaintiff's contention that the legislative body must find facts demonstrating that employment agencies are affected with a public interest before the maximum rates charged by these agencies may be regulated under the United States Constitution is without merit. Since we can conceive of facts establishing a public interest in regulating the rates charged by these agencies such a regulation is not per se invalid under the Fourteenth Amendment.

■ Plaintiff suggests, without citing any authority, that even if not invalid under the federal constitution, we might hold this resolution invalid under Const. art. 1, § 3. We note first that our constitutional provision, "No person shall be deprived of life, liberty, or property, without due process of law", is the same as that in the federal constitution; and that the federal cases while not necessarily controlling should be given "great weight" in construing our own due process provision. *See Herr v. Schwager,* 145 Wash. 101, 258 P. 1039 (1927). We should also note that most of our decisions concerning due process limitations upon the exercise of the police power do not distinguish between due process

under the federal and state constitutions. In all of our cases upholding the governmental exercise of police power, the limitations imposed by our state constitution were necessarily considered.

■ Our cases uniformly state that exercises of the police power are subject to judicial review. This is often stated by saying that each exercise of the police power must pass "the judicial test of reasonableness." *E.g., Remington Arms Co. v. Skaggs,* 55 Wn.2d 1, 345 P.2d 1085 (1959); *State v. Spino,* 61 Wn.2d 246, 377 P.2d 868 (1963). However, we have already noted that there are limitations upon this review. Otherwise courts would merely be engaging in a "race of opinions" with legislative bodies as to the wisdom of legislation. *See Lenci v. Seattle,* 63 Wn.2d 664, 675, 388 P.2d 926 (1964); *Lillions v. Gibbs,* 47 Wn.2d 629, 289 P.2d 203 (1955).

The precise limits of this judicial review, however, are often inadequately defined. There are four tests which a rate regulation measure must meet in order to pass "the judicial test of reasonableness":

First, any legislation under the police power must be reasonably necessary in the interest of the public health, safety, morals, and the general welfare. *E.g., Reesman v. State,* 74 Wn.2d 646, 445 P.2d 1004 (1968); *State v. Spino, supra; Clark v. Dwyer,* 56 Wn.2d 425, 353 P.2d 941 (1960); *Remington Arms Co. v. Skaggs, supra.* In applying this test, courts utilize the presumption mentioned earlier—if a state of facts justifying the legislation can be conceived to exist, the existence of these facts will be presumed. This presumption severely limits judicial review at this stage, because in order to fail this first test there must be no reasonably conceivable state of facts creating a public need for regulation.

The second general test requires that even though the activity in question be subject to police power regulation, the legislation must be substantially related to the evil sought to be cured. (This evil may have been presumed under the first test; so that discussions of these two tests in opinions are usually interrelated.) *See e.g., State ex rel.*

*Rhodes v. Cook,* 72 Wn.2d 436, 433 P.2d 677 (1967); *Treffry v. Taylor,* 67 Wn.2d 487, 408 P.2d 269 (1965).

The third test is really an offshoot of the second with some equal protection overtones. It requires that the classes of businesses, products or persons regulated, or the various classes established within the legislation be reasonably related to the legitimate object of the legislation. *See County of Spokane v. Valu-Mart, Inc.,* 69 Wn.2d 712, 419 P.2d 993 (1966).

The fourth test is also a specialized application of the second which is peculiar to rate regulation. It requires that the rates set be reasonable, and not unnecessarily prohibitory and confiscatory. *See People v. Albrecht,* 145 Colo. 202, 358 P.2d 4 (1960).

These four tests represent the limits of judicial review of legislative enactments under the police power. The courts will not examine the motives of the legislative body; they will not require factual justification for the legislation if it can reasonably be presumed; and the courts will not weigh the wisdom of the particular legislation enacted.

Plaintiff points out that this court has never sustained rate regulation legislation for businesses not historically "affected with a public interest." That concept was essentially discarded by the United States Supreme Court in *Nebbia v. New York,* 291 U.S. 502, 78 L. Ed. 940, 54 S. Ct. 505 in 1934, and counsel have not cited us any case where we have utilized it since and we have been able to find none. The wisdom or expediency of price fixing legislation is a battle to be fought in the legislatures and not in the courts.

The recent cases in which courts have struck down economic legislation are all explained by the four tests set forth above. *State Bd. of Dry Cleaners v. Thrift-D-Lux Cleaners,* 40 Cal. 2d 436, 254 P.2d 29 (1953), and similar cases involving regulation of rates charged by barbers, dry cleaners, etc., all involved the legislative enactment of *minimum* rates. One effect of this sort of legislation is to provide price supports for a particular trade which a court

might decide is not conceivably within the public interest. Likewise our decision in *Remington Arms Co. v. Skaggs, supra,* and many of the cases cited therein involved artificial price supports. The decisions in *Spokane v. Valu-Mart, Inc., supra* (invalidating a highly selective Sunday closing law), and *Ralph v. Wenatchee,* 34 Wn.2d 638, 209 P.2d 270 (1949), (striking down a license fee for itinerant photographers) are examples of failure to meet the second and third tests suggested.

It is apparent that the resolution satisfies the first three of the four tests outlined above. We can conceive of facts giving rise to a public interest in employment agency regulation. We can conceive of abuses at which regulation of the maximum fees would be reasonably and substantially directed. Employment agencies are sufficiently unique to warrant regulation of them as a class.

The final question remaining under both federal and state due process clauses is whether the rates set by this resolution are unreasonable and unnecessarily prohibitory. We note at the outset that any ordinance regularly enacted is presumed constitutional. *E.g., Spokane v. Carlson,* 73 Wn.2d 76, 436 P.2d 454 (1968). We also note that a business may even be prohibited under the police power where such is a reasonable regulation in the public interest. *See, e.g., Sunny Brook Farms v. Omdahl,* 42 Wn.2d 788, 259 P.2d 383 (1953). It is only where rates set by legislation are unreasonably and unnecessarily confiscatory and prohibitory that due process objections arise. *See People v. Albrecht, supra; Murphy v. Eldridge,* 201 Okla. 501, 207 P.2d 260 (1949). *Cf., State ex rel. Pacific Tel. & Tel. Co. v. Department of Pub. Serv.,* 19 Wn.2d 200, 142 P.2d 498 (1943).

Plaintiff introduced evidence that the fees set by the resolution averaged 70 per cent of the fees it is now charging; that it showed a modest profit between April 1, 1966, and January 31, 1967; that it employed several "counselors" during this period who were paid on a commission basis; and that it would be unable to employ all of these people under the rates set by the new resolution. It further con-

tends that it would be unable to stay in business, giving the service it was giving, while complying with the resolution. The evidence introduced by the county in support of the rates set is minimal, but upon the evidence we do not feel that plaintiff has carried its burden of establishing the unreasonableness of the rates. It has not proved or even alleged that the rates set would prohibit its continuance in business. It has failed to establish the effect of the ordinance upon any of the other employment agencies operating in King County. As plaintiff points out, there are 80 private employment agencies in King County operating not only in competition among themselves, but also competing with the various governmental employment services which render their services without charge. It is highly likely that some of these private agencies are marginal operations which might falter under any regulation that increases costs or reduces gross income—whether this regulation consisted of rate regulation or not. Under these circumstances, we do not feel that the mere fact that plaintiff may be unable to continue its present method of operation and offering its present services per se establishes the unreasonableness of the rates set by the resolution; nor does this evidence overcome the presumption of validity favoring the resolution.

It has been repeatedly held by this court and others that reasonable costs imposed upon businesses by otherwise valid exercises of the police power do not amount to a taking of property without compensation. Rather, reasonable expenses resulting from police power regulation must be borne as part of the cost of doing business. As stated in *Day-Brite Lighting, Inc. v. Missouri*, 342 U.S. 421, 424, 96 L. Ed. 469, 72 S. Ct. 405 (1952):

> Of course many forms of regulation reduce the net return of the enterprise; yet that gives rise to no constitutional infirmity. [Citations omitted.] Most regulations of business necessarily impose financial burdens on the enterprise for which no compensation is paid. Those are part of the costs of our civilization.

A similar conclusion was reached in another case upholding the reasonableness of rates set by legislation regulating employment agencies. *Gail Turner Nurses Agency, Inc. v. State of New York,* 17 Misc. 2d 273, 190 N.Y.S.2d 720 (1952):

> It should be noted that by engaging in a business subject to regulation, plaintiffs thereby assumed the hazard of changes in the law under the exercise of the State's police power. As heretofore stated, legislation enacted pursuant to the police power of a governing body is not rendered invalid because it imposes financial hardship, diminishes property value or reduces income, even if such injury results in irreparable damage to a particular business [citations omitted].

The test of constitutional effect of expenses imposed by exercises of the police power was set forth by this court in *Sittner v. Seattle,* 62 Wn.2d 834, 839, 384 P.2d 859 (1963):

> The plaintiffs contend that compliance with the ordinance makes it economically infeasible for a continuation of their business and that the ordinance is therefore oppressive and a taking of their property without due compensation. Economic hardships often inevitably result from laws and ordinances enacted or adopted for the protection of the public health and welfare; this, however, cannot affect their constitutional validity unless they are shown to be clearly unreasonable and discriminatory. [Citations omitted.] The plaintiffs have not shown that Ordinance No. 90000 is unreasonable or discriminatory, and their contention, therefore, cannot be sustained.

A determination that the rates are unreasonable and thus violative of the constitution requires that there be a debilitative effect upon the industry as a whole which is not reasonably necessary to meet and correct the evil sought to be cured. Plaintiff has not carried its burden of establishing the unreasonableness of the rates by merely introducing evidence that the gross income of its agency would be reduced.

The cases cited by plaintiff, *Boomer v. Olsen,* 143 Neb. 579, 10 N.W.2d 507 (1943); *Murphy v. Eldridge, supra;* and *People v. Albrecht, supra,* which all held rates set by em-

ployment agency regulation to be unreasonable, are not apposite to the regulation now under consideration. The regulations considered in *Albrecht* and *Murphy,* allowed employment agencies to charge prospective employees a maximum of 5 per cent of 1 month's salary. In *Boomer,* the maximum fee set was 10 per cent of 1 month's salary. The King County resolution, on the other hand, sets maximum rates of between 25 and 50 per cent of 1 month's salary for all except temporary employment.

Plaintiff also suggests that even though the police power of the state might justify a regulation fixing maximum rates to be charged by employment agencies, the police power of a county is not that extensive. It is argued that to allow counties to engage in rate fixing would result in division of the state into 39 separate markets, each with separate price structures.

 We have frequently held that Const. art. 11, § 11, is a direct delegation of the police power to cities and counties, and that the power delegated is as extensive within their sphere as that possessed by the legislature. *Detamore v. Hindley,* 83 Wash. 322, 145 P. 462 (1915); *Linsler v. Booth Undertaking Co.,* 120 Wash. 177, 206 P. 976 (1922); *Bellingham v. Schampera,* 57 Wn.2d 106, 356 P.2d 292 (1960). The only limitations upon municipal exercises of the police power are that the subject matter must be local and that the regulation must be reasonable and not conflict with general laws. *E.g., Lenci v. Seattle,* 63 Wn.2d 664, 388 P.2d 926 (1964). This resolution regulates only those employment agencies in King County. Its effect on business outside the county is only incidental. *Cf., Wilson v. Mountlake Terrace,* 69 Wn.2d 148, 417 P.2d 632 (1966). While it is true that county regulation of rates may result in dissimilar market conditions throughout the state, the same effect could also result from various county licensing and standards regulations. This effect is not sufficient to render these regulations nonlocal in character.

 Plaintiff next argues that the state legislature has preempted the field of price regulation with the Fair Trade Act (RCW 19.89) and the Unfair Practices Act

(RCW 19.90). This court considered the effect of state legislation upon the police power of municipalities in *Lenci v. Seattle, supra,* at 669:

> We have stated that the plenary police power in regulatory matters accorded municipalities by Const. Art. 11, § 11, ceases when the state enacts a general law upon the particular subject, unless there is room for concurrent jurisdiction. [Citations omitted.]
>
> Whether there be room for the exercise of concurrent jurisdiction in a given instance necessarily depends upon the legislative intent to be derived from an analysis of the statute involved. [Citations omitted.] If the legislature is silent as to its intent to occupy a given field, resort must be had to the purposes of the legislative enactment and to the facts and circumstances upon which the enactment was intended to operate. If, however, the legislature affirmatively expresses its intent, either to occupy the field or to accord concurrent jurisdiction, there is no room for doubt.

We find nothing in either the Fair Trade Act or the Unfair Practices Act which indicates a legislative intent to preclude municipalities from regulating rates charged by employment agencies or other businesses. The Fair Trade Act is an attempt to protect trademark owners by allowing them to set resale prices under certain conditions; while the Unfair Practices Act is an effort to curb attempts to destroy competition by discriminatory price cutting. Neither act attempts to directly alleviate injuries to consumers resulting from excessive charges—an abuse which the county commissioners may have found to exist in the employment agency field. A state statute is not to be construed as impliedly taking away a power of a municipal government to regulate in an area if the two enactments can be harmonized. *See Seattle v. Wright,* 72 Wn.2d 556, 433 P.2d 906 (1967). We find no conflict between this resolution and state legislation cited to us by plaintiff. The resolution is not preempted by general law.[2]

---

[2] We note that effective July 1, 1969, this resolution will become inoperative as to its price fixing feature by virtue of the express provision of Substitute Senate Bill 174 (Laws of 1969 Ex. Ses. ch. 228). By the terms of that state legislation the matter of regulation of

Plaintiff's final assignment of error is an evidentiary point. The resolution allows higher maximum rates to be charged by employment agencies than a similar Seattle city ordinance which was offered into evidence by the county and admitted. Plaintiff then offered in evidence a letter from the corporation counsel of Seattle indicating that he interpreted the Seattle ordinance as setting only maximum fees that could be charged to employees, while the agencies were free under the ordinance to charge any fee to an employer. Objection to this proposed exhibit was sustained. Plaintiff argues that once the county was allowed to enter the Seattle ordinance in evidence an inference was raised that if employment agencies were operating under the rates set by that ordinance, they could certainly operate under the higher rates set by the King County resolution. Plaintiff sought to combat this inference with this legal opinion that Seattle employment agencies were free to charge employers any rate they pleased.

Generally, a legal conclusion is not admissible in evidence. Plaintiff agrees with this principle, but argues that here the legal effect of the Seattle ordinance is not in question. The letter was offered to show the fact that Seattle employment agencies were being allowed to charge rates in addition to those set forth in the Seattle ordinance. Whether the letter should have been admitted upon this ground is at best dubious. But, in any event, as we have noted earlier, plaintiff has failed to show that the rates set by the King County resolution are unreasonable and confiscatory as applied to the industry as a whole and compared with the purpose of the regulation. The letter, if admitted,

---

employment agencies has been preempted by the state and thus, by virtue of the provisions of Const. art 11, § 11, counties and cities are deprived of this area of police power. We have considered whether this state legislation renders this case moot, but we cannot so hold. Plaintiff has continued to operate under a temporary injunction and bond whereby the county has been enjoined from enforcing the resolution as to plaintiff pending this appeal. The rights of the parties remain—until July 1, 1969—justiciable.

would not affect this conclusion. Therefore, any error in refusing to admit the letter was harmless.

Affirmed.

HUNTER, C. J., HILL, FINLEY, ROSELLINI, HAMILTON, HALE, and McGOVERN, JJ., and RYAN, J. Pro Tem., concur.

\*Reported in 459 P.2d 930.