[No. 42547.  En Banc.  July 19, 1973.]

HILDUR JOSEPHINE HUGHES *et al., Petitioners,* v. A. LUDLOW KRAMER, *Secretary of State, Respondent.*

*Robert T. Czeisler,* for petitioners.

*Slade Gorton, Attorney General,* and *Wayne L. Williams, Assistant,* for respondent.

HAMILTON, J.—Petitioners, Hildur Josephine Hughes and Eric Lindberg, are avowed members of the Communist Party. Both were nominated as candidates for state repre-

sentative from the 35th and 27th legislative districts, respectively, by their party assembled in minor party convention. RCW 29.24. Both refused to sign the affidavit of candidacy which, pursuant to RCW 29.24.070,[1] must be submitted before a nominee may be certified as an official candidate and obtain a place upon the ballot. The affidavit required is set forth in RCW 29.18.030 as follows:

> FURTHER, I do solemnly swear (or affirm) [(1)] that I will support the Constitution and laws of the United States and the Constitution and laws of the state of Washington; [(2)] that I do not advocate the overthrow, destruction, or alteration of the constitutional form of government of the United States or of the state of Washington or any political subdivision of either of them, by revolution, force or violence, and [(3)] that I do not knowingly belong to any organization, foreign or otherwise, which engages in or advocates, the overthrow, destruction or alteration of the constitutional form of government of the United States or of the state of Washington or any political subdivision of either of them, by revolution, force or violence.

Petitioners objected to clauses 2 and 3 and proffered affidavits by the terms of which they swore to clause 1 only. The Secretary of State, asserting that he was required to adhere to the applicable statutes, refused to accept such modified affidavits. Challenging the constitutionality of clauses 2 and 3, petitioners sought a writ of mandate compelling the Secretary of State to accept their proffered affidavits and place their names upon the November, 1972, general election ballot.

---

[1]RCW 29.24.070:

"Declarations of candidacy required. If the nominating certificate is valid, each candidate nominated by a minor party convention may file with the secretary of state a declaration of candidacy as nearly as possible in the form prescribed for candidates subject to primary election, and each candidate must at the time of filing such declaration pay to the secretary of state the fee prescribed by law for candidates subject to primary election. The name of a candidate nominated at a minor party convention shall not be printed upon the election ballot unless he pays the fee required by law to be paid by candidates for the same office to be nominated at a primary election."

Petitioners' application came on for hearing before the court, sitting en banc, on September 25, 1972. Because the Secretary of State had to certify candidates for office by October 16, 1972, the court, after carefully considering and evaluating petitioners' contentions and arguments, issued a preopinion order which, in pertinent part, provided:

> [I]t is ordered that petitioners' application is hereby denied upon the basis that the affidavit required by RCW 29.18.030 is constitutional when construed to mean only that the affiant signing such affidavit is not then intentionally engaged in one way or another in an attempt to overthrow the government by force or violence, or by illegal and unconstitutional means, and that the affiant is not intentionally and purposefully a member of an organization engaged in such an attempt.

Essentially, petitioners contend that the provisions of clauses 2 and 3 of the statutory oath contravene the rights guaranteed to them under the first and fourteenth amendments to the United States Constitution, asserting that the respective clauses are unconstitutional on their face, overbroad, and unduly vague and uncertain.

In support of their challenges, petitioners point primarily to the words "advocate", "alteration", and "revolution", as utilized in clauses 2 and 3 of the statutory oath. Petitioners assert these words, when given a literal interpretation, bring within the sweep of the oath constitutionally protected speech activities and lawful modifications or changes in government. In furtherance of their contentions, petitioners rely principally upon *Baggett v. Bullitt,* 377 U.S. 360, 12 L. Ed. 2d 377, 84 S. Ct. 1316 (1964); *Keyishian v. Board of Regents,* 385 U.S. 589, 17 L. Ed. 2d 629, 87 S. Ct. 675 (1967); and *Brandenburg v. Ohio,* 395 U.S. 444, 23 L. Ed. 2d 430, 89 S. Ct. 1827 (1969).

As indicated by our order of October 16, 1972, we cannot agree with petitioners' broad, literal approach to the language of the statutory oath nor with their reliance upon the cases cited.

In reaching our conclusion, we start from the prem-

ise that oaths to support the constitutions and laws of the state and nation, such as contained in clause 1 of the instant oath, are clearly regarded as valid under the first and fourteenth amendments to the Constitution of the United States. *Bond v. Floyd*, 385 U.S. 116, 17 L. Ed. 2d 235, 87 S. Ct. 339 (1966); *Ohlson v. Phillips*, 397 U.S. 317, 25 L. Ed. 2d 337, 90 S. Ct. 1124 (1970). Indeed, such oaths in certain instances are constitutionally mandated. The eighth paragraph of article 2, section 1, and the third paragraph of article 6, of the United States Constitution, respectively, provide that the President and all state and federal officers shall be bound by an oath to support the constitution.

■ Concomitantly, and in keeping with common sense and the common law, our state and federal governments can take appropriate measures to protect and guard against overthrow by force, violence, rebellion, or other illegal or unconstitutional means, including conditioning public employment upon employee abstinence from knowingly and intentionally undertaking, individually or associatively, the violent and unlawful overthrow of the government. *Gerende v. Board of Supervisors of Elections*, 341 U.S. 56, 95 L. Ed. 745, 71 S. Ct. 565 (1951); *Dennis v. United States*, 341 U.S. 494, 95 L. Ed. 1137, 71 S. Ct. 857 (1951); *Garner v. Board of Pub. Works*, 341 U.S. 716, 95 L. Ed. 1317, 71 S. Ct. 909 (1951); *Law Students Civil Rights Research Council v. Wadmond*, 401 U.S. 154, 27 L. Ed. 2d 749, 91 S. Ct. 720 (1971); *Cole v. Richardson*, 405 U.S. 676, 31 L. Ed. 2d 593, 92 S. Ct. 1332 (1972).

The power of governmental self-preservation is, of course, not absolute. The first amendment, as well as the fourteenth amendment, to the United States Constitution poses pertinent limitations. Thus, security measures in the form of required oaths may not impinge upon First and Fourteenth Amendment freedoms and privileges either directly or indirectly, or tangentially through the vice of impermissible vagueness or overbreadth. Among the rights so protected are the freedoms of political belief, expression, dissension, criticism, and associational activity, including

membership in organizations having illegal purposes, unless such purposes are individually known and a specific intent be entertained to accomplish those purposes. *Cramp v. Board of Pub. Instruction,* 368 U.S. 278, 7 L. Ed. 2d 285, 82 S. Ct. 275 (1961); *Baggett v. Bullitt, supra; Elfbrandt v. Russell,* 384 U.S. 11, 16 L. Ed. 2d 321, 86 S. Ct. 1238 (1966); *Keyishian v. Board of Regents, supra; Whitehill v. Elkins,* 389 U.S. 54, 19 L. Ed. 2d 228, 88 S. Ct. 184 (1967); *Brandenburg v. Ohio, supra; Baird v. State Bar,* 401 U.S. 1, 27 L. Ed. 2d 639, 91 S. Ct. 702 (1971); *Connell v. Higginbotham,* 403 U.S. 207, 29 L. Ed. 2d 418, 91 S. Ct. 1772 (1971); *Cole v. Richardson, supra.*

Full recognition and acknowledgment of the individual rights and privileges constitutionally guaranteed must be accorded by legislatures in prescribing, and courts in adjudging, oaths of allegiance as a condition to public employment. It is essential, in this regard, to bear in mind that the mere abstract advocacy of an idea or belief embracing a concept of force or violence, and the mere knowing membership in an organization espousing an unlawful purpose, standing alone, are constitutionally protected. The line of demarcation comes when advocacy is directed to and becomes an active incitement to imminent violence or illegal action, and organizational membership is accompanied by a specific intent to carry out a known lawless purpose of the organization. *Keyishian v. Board of Regents, supra; Brandenburg v. Ohio, supra; Cole v. Richardson, supra.*

In the instant case, we do not believe the statutory oath suffers from the same vices found in the statutory schemes involved in the *Baggett, Keyishian,* or *Brandenburg* cases. In each of those cases the statutes involved were couched in broad sweeping terms, embracing such verbs, nouns, and adjectives, in conjunction with advocacy, as "advise", "teach", "utterance", "embraces", "treasonable", "seditious", "duty", "necessity", and "propriety", thereby rendering them incapable of meaningful and objective measurement in terms of the extent of their application.

In enacting clauses 2 and 3 of the oath prescribed in

RCW 29.18.030, we are satisfied the legislature was fully cognizant of the constitutional limitations involved, and sought to be narrowly precise and prudent in the language utilized. Being of that mind, we are convinced that the legislature employed and intended the words "advocate", "advocates", "alteration", and "revolution" in clauses 2 and 3 of the oath, within the context of respective clauses as a whole, to mean personal or organizational advocacy to the point of incitement to imminent overthrow and destruction of constitutional government by force, violence, or overt rebellion, and that the word "knowingly", as utilized in the context of clause 3, was intended to connote and import the concept of membership in an organization dedicated to the overthrow of constitutional government by unlawful and unconstitutional means, with individual knowledge of such purpose and with a specific intent to carry out that purpose.

So construed and interpreted, clauses 2 and 3 of the prescribed oath do not run afoul of constitutional limitations imposed by the First and Fourteenth Amendments, for they do not proscribe free individual or organizational political exposition or action, even though such activities be directed toward the end of a sudden, radical—yet lawful— change in our form of government.

It is for the foregoing reasons that we entered the order of October 16, 1972, denying petitioners' application for a writ of mandate and to which order we now adhere.

HALE, C.J., FINLEY, HUNTER, and STAFFORD, JJ., concur.

FINLEY, J. (concurring)—History is replete with evidence that loyalty oaths can be a most dubious device in terms of the commonweal. Apparently, as often as not, they have been used or abused as instruments of oppression in situations of plain power politics. The implicit purpose of those founding fathers who drafted the United States Constitution and our state constitutions was to structure a system of government and social justice which, abjuring violence, would promote the safety and security of citizens in their

homes in a manner conducive to life, liberty, and the pursuit of happiness. Toward this end, the framers of the United States Constitution, article 2, section 1, prescribed an oath of office for the President as follows:

"I do solemnly swear (or affirm) that I will faithfully execute the office of president of the United States, and will to the best of my ability, preserve, protect and defend the Constitution of the United States."

Similarly, the framers of the state constitution required an oath by judges to support the constitutions and laws of the United States and of the State of Washington. Const. art. 4, § 28. Furthermore, I think our citizenry seem to place a value and derive some solace from the requirement of such oaths. As a consequence, in my judgment, it is not for the courts to gainsay historical precedent and the feelings and faith of the people by an assumed judicial clairvoyancy that any and all oaths for candidates for public office are improper because some loyalty oaths have been misused by political forces exercising extremes of power for an oppressive but transient period of time in history.

It is, I believe, incumbent upon the courts to carefully and objectively evaluate the constitutional validity of any loyalty oath submitted for judicial consideration. This, the United States Supreme Court has cautiously and meticulously done.

Over the past decade, the court has developed certain guidelines or rules of construction, as well as a body of substantive law interpreting particular terms and phrases which have frequently appeared in loyalty oaths. In *Baggett v. Bullitt*, 377 U.S. 360, 12 L. Ed. 2d 377, 84 S. Ct. 1316 (1964), the court indicated that the term "revolution", appearing in a loyalty oath, was suspect and would not pass constitutional muster *unless clearly it related to and proscribed the overthrow of government by means of force and violence.* In considering the language of the loyalty oath before it, the court deemed it proper to indulge "every presumption of a narrow construction" of proscriptive language. *Baggett v. Bullitt, supra* at 372. That same year, in

*Aptheker v. Secretary of State*, 378 U.S. 500, 12 L. Ed. 2d 992, 84 S. Ct. 1659 (1964), the court warned against legislative enactments which invade the area of freedoms protected by the First Amendment, indicating that although it is permissible to construe legislation to preserve it against constitutional attack, the courts must not pervert the purpose of the statute by judicial construction. In 1967, the court reviewed the term "advocate" in *Keyishian v. Board of Regents*, 385 U.S. 589, 17 L. Ed. 2d 629, 87 S. Ct. 675 (1967) as it appeared in a loyalty oath. In ruling that the mere *abstract advocacy* of a proscribed doctrine without any attempt to indoctrinate others constitutes a legitimate personal liberty, the court clarified and distinguished impermissible and constitutionally unprotected advocacy as active incitement of others "to action in furtherance of unlawful aims." *Keyishian v. Board of Regents, supra* at 599-600. This construction of the term "advocate" was affirmed and further elaborated upon in *Brandenburg v. Ohio*, 395 U.S. 444, 447, 23 L. Ed. 2d 430, 89 S. Ct. 1827 (1969), where the court held the following:

> [T]he constitutional guarantees of free speech and free press do not permit a State to forbid or proscribe advocacy of the use of force or of law violation *except where such advocacy is directed to inciting or producing imminent lawless action and is likely to incite or produce such action.*

(Italics mine.) In summary, the court has consistently ruled that violence to life, limb or property, and the incitement thereto, may be proscribed by loyalty oath. Mindful of the development of the law in this area, it was in this context of proscribing active or imminent violence as the means for alteration, overthrow and destruction of government that this court initially reviewed and dismissed by an emergent order the instant challenge to the Washington candidate loyalty oath. Given the judicial prerogative—if not duty—to construe this loyalty oath as consistent with constitutional limitations, I was and still am convinced that the immediate oath does not exceed constitutional bounds

in its proscription of activity which involves, or is imminently related to, force and violence inimical to public safety, and domestic tranquility.

It is well settled that not all human conduct involving vocalization or other forms of speech is purified beyond the pale of proscriptive law by the First Amendment. Incitement to imminent violence, riot, or unlawful activity, as specifically proscribed in *Brandenburg*, receives no protection from the First Amendment. *See, e.g., Feiner v. New York*, 340 U.S. 315, 95 L. Ed. 295, 71 S. Ct. 303 (1951) (incitement to riot). In fact, the constitution affords no shield for violent demonstrations (*see, e.g., Adderly v. Florida*, 385 U.S. 39, 17 L. Ed. 2d 149, 87 S. Ct. 242 (1966)), nor for slander and libel (*see, e.g., Time, Inc. v. Hill*, 385 U.S. 374, 17 L. Ed. 2d 456, 87 S. Ct. 534 (1967)), nor for annoying, disruptive, and distracting speech which emanates from vehicles equipped with sound amplifying devices (*see Kovacs v. Cooper*, 336 U.S. 77, 93 L. Ed. 513, 69 S. Ct. 448, 10 A.L.R.2d 608 (1949)). Thus, the term "advocate" does not carry with it the unconditional protection of the First Amendment and where, as in the immediate oath, it is cast in terms of violent activity, it must be construed as that unprotected form of speech or conduct which incites imminent violence. As such, it is properly proscribed in the Washington loyalty oath for candidates for public office.

Similarly, the challenged term "revolution", when read in the context of the qualifying terms in the oath which accompany it, necessarily relates to and involves force or violence and the destruction or overthrow of government by such means. Construing the term "revolution" in the Washington oath to mean or encompass both peaceful and violent change in government leaves neither purpose nor basis in logic for the remaining terms "force" and "violence"; both would be vitiated or subsumed by such a broad construction of the subject term. The general meaning of the term revolution certainly would include substantial and sweeping, dramatic or even radical change in the structure of government. But, if such change were peaceful,

by peaceful means and without force and violence, this would not be proscribed by the oath as construed herein. Given the narrow and only logical construction of "revolution" as it appears in this oath, as embracing imminent force or violence, the legislature was justified in prescribing this oath for candidates for public office.

Although the legislature might well reexamine and reconsider the draftsmanship employed in RCW 29.18.030 in the light of opinions of the members of the court in this case, it seems to me that the challenged terms in the full context of the instant loyalty oath bear no constitutional infirmity in reasonably proscribing active or imminent incitement to violence respecting the overthrow, destruction, or alteration of government.

Before concluding I feel compelled to express some words of caution to any elective or other public officials. Namely, the oath here involved must be construed and applied strictly in accordance with the analysis, evaluation, and the views expressed by the majority of this court. Any deviation therefrom will be subject to constitutional invalidation in an appropriate proceeding in the courts of this state.

For the reasons indicated, I join the majority in affirming the initial order of this court.

STAFFORD, J., concurs with FINLEY, J.

WRIGHT, J. (dissenting)—I do not express any view on the matter of the wisdom or the efficacy of a loyalty oath. The wisdom of legislation is within the discretion of the legislature. We are concerned only with whether the act in question violates a specific prohibition of the state or federal constitution.

The first amendment to the United States Constitution reads:

> Congress shall make no law respecting an establishment of religion, or prohibiting the free exercise thereof; or abridging the freedom of speech, or of the press; or the right of the people peaceably to assemble, and to petition the government for a redress of grievances.

While the First Amendment is only a restriction on the powers of Congress, the protections thereof were extended to protect against the acts of states by the Fourteenth Amendment.

In *Edwards v. South Carolina*, 372 U.S. 229, 9 L. Ed. 2d 697, 83 S. Ct. 680 (1963), it was said at page 235:

It has long been established that these First Amendment freedoms are protected by the Fourteenth Amendment from invasion by the States. [Citations omitted.]

The First Amendment protects the freedom of speech, one of the protections demanded by the citizens of the original 13 states as a condition for ratifying the constitution. The meaning of the First Amendment becomes clear when viewed against the backdrop of history. The original states had just finished throwing off the oppressive yoke of the English tyrants. They had fought and won a war to gain liberty from despotism. Two of the most cherished rights for which the Revolutionary War was fought were the freedom of religion and the freedom of speech. It is significant that those rights were enunciated in the *First* Amendment.

Certainly the freedom of speech which was in the minds and hearts of our forefathers was the freedom to speak freely on matters of religion and politics. Specifically, the right to *advocate* the use of force against an existing government was uppermost in their thoughts. It takes but little imagination to guess the fate of those who *advocated* the Boston Tea Party had they been detected by the agents of the King of England.

When thus viewed, it is unthinkable that legislation should curtail the exercise of a right to speak freely on matters of government. The right to speak freely includes the right to express views which may be unpopular, views which may not accord with those of the majority. Even an opinion held by only one person is entitled to be brought into the open and be freely expressed.

That an opinion is unpopular is not reason to prohibit the

548

expression of such opinion. *Edwards v. South Carolina, supra; Terminiello v. Chicago*, 337 U.S. 1, 93 L. Ed. 1131, 69 S. Ct. 894 (1949). Herein no opinion is expressed as to the wisdom or the efficacy of a loyalty oath. The wisdom of legislation rests solely within the discretion of the legislature. *Treffry v. Taylor*, 67 Wn.2d 487, 408 P.2d 269 (1965). We said in *Petstel, Inc. v. County of King*, 77 Wn.2d 144, 151, 459 P.2d 937 (1969): "It is the function of the judiciary to test legislation against constitutional restrictions. Courts do not review the wisdom of legislative acts or the policy contained therein."

While nothing said herein is to be construed as indicating any view that there is a constitutional protection for inciting violence as distinguished from merely advocating same, no such problem is before the court. Just as courts should refrain from expressing views on the wisdom of legislation, so should courts refrain from expressing views on matters not presented for decision.

For the reasons stated, the petition should be granted.

ROSELLINI and UTTER, JJ., concur with WRIGHT, J.

Petition for rehearing denied September 14, 1973.