[No. 44986.   En Banc.   June 8, 1978.]

HOMES UNLIMITED, INC., ET AL, *Respondents*, v. THE CITY OF SEATTLE, *Petitioner*.

*John P. Harris, Corporation Counsel,* and *Lawrence K. McDonell* and *Douglas Jewett, Assistants,* for petitioner.

*Olwell, Boyle & Hattrup, Lee Olwell, Goodin & Garvey, Paul A. Goodin,* and *Leo F. Garvey,* for respondents.

*Charles E. Ehlert* on behalf of Washington Public Interest Research Group, amicus curiae.

ROSELLINI, J.—In *Homes Unlimited, Inc. v. Seattle,* 17 Wn. App. 47, 561 P.2d 1089 (1977), the Court of Appeals, Division One, upheld the validity of Seattle ordinance No. 104214, regulating housing rental agencies. However, it held unconstitutional a provision which makes it unlawful for such agencies to

> [r]equire any customer to pay a fee or charge prior to such customer entering into a rental agreement or lease for a housing accommodation obtained from the rental agency.

We granted Seattle's petition for review of that ruling.

The ordinance in question was passed after customers' complaints had led to investigation of the practices of housing rental agencies. Such agencies, which sell information about available rental accommodations but do not act as agents between the landlord and tenant, are relatively new on the housing scene and have proven profitable because of the housing shortage. The City had before it evidence that such agencies are exploitative of persons seeking rental housing.[1] As a result of abuses which it

---

[1] The evidence before the council included the following, taken from the superior court findings:

"1. Seattle consumers paid $344,867 to rental agencies in 1973 for help finding places to live. At an estimated average of $25 per contract, the number of contracts purchased in 1973 is estimated at 13,795.

"2. 50.7% (Or 733 out of a total of 1449) of the ads published by Rentex in the Homes for Rent classified ad columns of the *Seattle Times* between·

found to exist, the ordinance in question was enacted, designed primarily to prevent the exaction of fees for housing information, over which the agencies appear to have exercised something approaching a monopoly, unless and until they supplied the information and rendered the services promised.

In addition to the prohibition of advance collection of fees, provisions which are set forth in the opinion of the Court of Appeals at page 49 regulated the advertising practices of such agencies and required them to make full disclosure of the services to be rendered to a prospective customer. It was the opinion of the Court of Appeals that these provisions were adequate to achieve the legislative purpose and that the advance fee prohibition bore "no substantial relation to the evils sought to be cured." The

November 26 and December 23, 1973, were for property which was not available for rent on the day of publication and which Rentex, on the day of publication, knew was not available for rent.

"3. Rentex personnel failed to give correct information to 26 out of 35 persons (74.3%) who called during that time to ask about the availability of property already listed in Rentex's office records as unavailable.

"4. Rentex's methods of doing business is to publish classified ads, most of which when checked were false on the day of publication, to induce consumers to pay $30 apiece for access to a substantially different series of rental listings than consumers are led to believe are available by the published ads. Consumers interested in a specific property and careful enough to call before paying to determine whether the property was still available, stood about a 1 in 4 chance of getting correct information from Rentex, during the period of this study. Deception was not an accidental or incidental part of this business: It was the main method of doing business.

"...

"7. The experience with Rentex indicates that consumers cannot necessarily protect themselves by taking the precaution of asking about availability of specific listings, and may still pay a front end fee to get the location of a particular property only to learn that it is not available.

"8. Because of the numbers of people involved, the amount of money involved, the increasing disparity between supply and demand for rental housing in Seattle, and the substantial evidence of potential for deception and actual deception on the part of the largest rental agency in Seattle, there is an urgent need to protect Seattle consumers from deceptive and abusive practices of rental agencies."

*Homes Unlimited, Inc. v. Seattle,* 17 Wn. App. 47, 50, 561 P.2d 1089 (1977).

There is evidence that some landlords found the services of the rental agencies beneficial to their interests. However, it was not the landlords who were required to pay for these services.

court's conclusion was evidently based upon an assumption that agencies could be expected to abide by the other provisions of the ordinance, with only the coercion provided by the requirement of a license and provision for criminal penalties. The court was also concerned that, according to a trial court finding, enforcement of this requirement would put the respondents out of business.

The petitioner contends that, in deciding that the objectives of the ordinance could be achieved without the prepayment prohibition, the Court of Appeals substituted its judgment for that of the legislative body with respect to the wisdom and necessity of the regulation. We agree.

■■ Rules and principles which govern the courts in examining the constitutionality of a statute, where it is contended that a law is unreasonable, are correctly noted in the opinion below. In summary, these are that a regularly enacted ordinance will be presumed to be constitutional, and the burden of showing otherwise rests heavily upon the challenger; that when a state of facts can be reasonably conceived which justifies the measure, it will be presumed to exist and the legislation to have been enacted in response to it; that business regulations enacted by a municipal corporation in the exercise of its police powers must meet the judicial test of reasonableness, which requires that they be reasonably necessary to protect the public health, safety, morals, and general welfare and that they be substantially related to the legitimate ends sought; and that while economic hardships often inevitably result from laws and ordinances enacted for the protection of the public health and welfare, such hardship cannot affect their constitutionality, unless they are shown to be clearly unreasonable and discriminatory. Cases cited for these various principles were *Petstel, Inc. v. County of King,* 77 Wn.2d 144, 459 P.2d 937 (1969); *Spokane v. Carlson,* 73 Wn.2d 76, 436 P.2d 454 (1968); *Lenci v. Seattle,* 63 Wn.2d 664, 388 P.2d 926 (1964); and *Sittner v. Seattle,* 62 Wn.2d 834, 384 P.2d 859 (1963).

Other controlling principles found in *Petstel, Inc. v. County of King, supra,* are that a law may not be struck down unless it is shown to be clearly unreasonable, arbitrary or capricious and that the wisdom, necessity and expediency of the law are not for judicial determination.

In *Petstel* we upheld a King County resolution fixing maximum rates for employment agencies against contentions that the measure was unnecessary, that it was beyond the police power because the business was not "affected with a public interest", and that it set rates which were unreasonable and unnecessarily prohibitory. It was maintained by the plaintiff there that the rates permitted were so low that it would be forced out of business. We said at page 158:

> A determination that the rates are unreasonable and thus violative of the constitution requires that there be a debilitative effect upon the industry as a whole which is not reasonably necessary to meet and correct the evil sought to be cured. Plaintiff has not carried its burden of establishing the unreasonableness of the rates by merely introducing evidence that the gross income of its agency would be reduced.

Other cases in which we have refused to set aside an ordinance, in spite of the fact that it resulted in severe economic hardship to persons affected, include *Sittner v. Seattle, supra* (enforcement of ordinance would make it economically unfeasible for a continuation of the plaintiffs' business); *Lenci v. Seattle, supra* (ordinance requiring wrecking yards to be fenced imposed economic hardship on owners); and *Sandona v. Cle Elum,* 37 Wn.2d 831, 226 P.2d 889 (1951) (parking ordinance would force plaintiffs out of trucking and warehouse business at their then location).

In harmony with the holdings of these cases that a law will not be found to be unconstitutional merely because it causes economic hardship, the United States Supreme Court in *Ferguson v. Skrupa,* 372 U.S. 726, 10 L. Ed. 2d 93, 83 S. Ct. 1028, 95 A.L.R.2d 1347 (1963), has unequivocally held that a legislative body may prohibit a business if it

finds that such business does not serve the public interest. There the business prohibited was, like the rental agencies involved here, a new type of enterprise. It was described as the business of "debt adjusting", and it was argued that the business was a legitimate and useful one. However, the legislature of Kansas found that the abuses practiced upon debtors were sufficient to warrant the prohibition of debt adjusting, except as an incident to the practice of law. The high court saw no occasion to discuss the wisdom or necessity of the law, but rather declared that those questions were strictly within the province of the legislature.

We turn to the case before us. Here there was evidence before the Seattle City Council which showed (and were we unaware of such evidence, we would not find it difficult to conceive) that fees were exacted by rental agencies before the information promised was supplied and that, thereafter, customers experienced great difficulty in getting access to information, that the information supplied was often erroneous, and that a great deal of frustration and disappointment was suffered by these customers. There was also evidence that such agencies are not very stable and frequently go out of business, leaving customers to whom services are still owed. When these facts are viewed in the light of the further fact that such agencies have gone far in "cornering the market" with respect to rental information, it is not surprising that the legislative body concluded that the prepayment of fees was an important factor which enabled and encouraged the negligent and indifferent rendering of promised services. As the petitioner points out, businesses do not customarily collect for services before they are delivered, and certainly the provision is not unreasonable on its face. It cannot be said that it bears no reasonable relation to the legislative objective. Whether it was necessary was properly a legislative decision.

It cannot be held as a matter of law that the criminal penalties and licensing provisions provide adequate remedies to achieve the legislative purpose. The City may well have determined that a provision forbidding the exaction of

prepayment was the most effective means of assuring that promised services would be rendered.

The respondents point to the trial court's finding that they will be forced out of business by this ordinance. While, as they maintain, they do indeed have the right to engage in a lawful business, they must do so in a lawful manner. The fact that, as a practical matter, they will have difficulty collecting fees if their present method of doing business is continued, does not make the ordinance confiscatory. This law being enacted pursuant to the City's police power and reasonably designed to achieve a legitimate purpose of the City, and not being shown to be clearly unreasonable, arbitrary or capricious, it is the respondents' obligation to conduct their businesses in conformance with it. If that cannot be done, the conclusion must be reached that the business is unlawful. Since the City had the right to find that the rental agency business was detrimental to the public interest and to forbid it altogether, the fact that it may have done so indirectly does not render the law invalid.

Since the provision in question bears a reasonable relation to the legislative purpose and is not shown to be clearly unreasonable, arbitrary, or capricious, and since the question of its necessity was solely for the consideration of the body which enacted it, the Court of Appeals erred in holding it unconstitutional. With respect to that provision, the decision is reversed and the judgment of the trial court is reinstated.

WRIGHT, C.J., and HAMILTON, STAFFORD, UTTER, BRACHTENBACH, HOROWITZ, DOLLIVER, and HICKS, JJ., concur.